IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ELIZABETH SANDBECK,          )
                             )
            Plaintiff,       )
                             )
      v.                     )      Civil Action No. 1:11cv0761 (JFA)
                             )
DANIELLE G. REYES, *et al.*, )
                             )
            Defendants.      )
_____)

## MEMORANDUM OF DECISION

This matter is before the Court following a one-day bench trial on March 6, 2012.[1]  At

trial, plaintiff Elizabeth Sandbeck ("plaintiff") testified, as did plaintiff's witnesses Diann Hicks,

Beverly Tatum, and Kim Farina.  Following the presentation of plaintiff's evidence, defendant

Danielle Reyes testified.  While present during the trial, defendant Jesse Reyes did not testify.  In

addition to witness testimony, Exhibits 1 through 15 were admitted into evidence as stipulated by

the parties.  Defendants' Exhibit 20 was also admitted into evidence.  In accordance with Federal

Rule of Civil Procedure 52(a), the Court provides the parties with the required findings of fact

and conclusions of law.

Plaintiff filed her complaint on July 19, 2011 seeking a judgment against defendants in

the amount of $189,919.51 for breach of contract plus costs and attorney's fees.  (Docket no. 1)

("Compl.").  Defendants have admitted that they entered into a binding contract for the sale of

real property and that they failed to perform their obligations under the contract.  The evidence

presented during the trial focused on the issue of what, if any, damages should awarded.

---

[1] Pursuant to the Consent to Proceed Before a United States Magistrate Judge executed by the parties, an Order was entered on October 21, 2011, referring this action to the undersigned in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Docket no. 11).

## FINDINGS OF FACT

1.  At the time the complaint was filed Elizabeth Sandbeck was a citizen of Florida.

2.  Danielle and Jesse Reyes were former residents of Virginia and at the time the complaint was filed they were citizens of Texas.

3.  The amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

4.  In May 2010, plaintiff entered into an Exclusive Right to Sell Listing Agreement ("Listing Agreement") with Weichert Realtors in which plaintiff appointed Weichert as her broker for the sale of real property located at 720 Gibbon Street in Alexandria, Virginia. Diann Hicks was the designated listing agent. Ex. 5.

5.  The Listing Agreement was amended on several occasions to reduce the listing price.

6.  In November 2010, plaintiff and defendants executed a Regional Sales Contract ("Sales Contract") for the sale and purchase of the property located at 720 Gibbon Street, Alexandria, Virginia. Ex. 1. The parties agreed to a sales price of $750,000.00; defendants agreed to make deposits totaling $20,000.00 into an escrow account between November 2010 and February 2011;[2] and plaintiff agreed to pay a $10,000.00 seller subsidy. Ex. 1 at ¶¶ 2, 4, 34; FHA Financing Contingency Addendum at ¶ 4. The parties also agreed to a March 29, 2011 settlement date. Ex. 1 at ¶ 6.

7.  Beverly Tatum, a real estate agent with Weichert Realtors, was the designated representative for the defendants (buyers) and Diann Hicks, also a real estate agent with Weichert Realtors and the listing agent, was the designated representation for the plaintiff

---

[2] Defendants were obligated to make 4 deposits into the escrow account on November 20, 2010 ($4,000.00); December 23, 2010 ($6,000.00); January 25, 2011 ($5,000.00); and February 25, 2011 ($5,000.00). Ex. 1 at ¶¶ 4, 34. Testimony at trial established that defendants honored their agreement and that the escrow account in fact contains $20,000.00.

2

(seller). On November 20, 2010, the parties executed a Disclosure of the Use of Designated Representatives since Weichert Realtors was representing both the seller and the buyers. Ex. 1.

8. Testimony offered at trial established that at the time the parties entered into the Sales Contract, defendants were aware of plaintiff's intention to move to Florida with her elderly mother following the closing but defendants did not have specific knowledge of plaintiff's intent to purchase property in Florida or what plaintiff intended to do with any proceeds from the sale of the property.

9. At the time the Sales Contract was executed and ratified Danielle Reyes was an attorney working at the law firm of Goodwin Procter in the District of Columbia. Following the unfortunate death of a colleague at work, Danielle Reyes decided to leave Goodwin Procter and she began looking for employment as in-house counsel. Initially her job search was focused on the D.C. metropolitan area but when she was unable to find a job in this region she began to consider moving out of the D.C. metropolitan area. She eventually interviewed for an in-house position in Texas and was offered a job on March 1, 2011. Danielle Reyes testified that on March 2, 2011, she notified her law firm that she was leaving to accept a job in Texas.

10. On March 2, 2011, defendants informed their real estate agent Beverly Tatum that they had decided to move to Texas and that they did not want to proceed to closing on the property. Defendant Danielle Reyes testified at trial that she and her husband, defendant Jesse Reyes, decided to move to Texas even though they knew that they were parties to a binding Sales Contract for the purchase of the property in Virginia.

11. On March 4, 2011, Diann Hicks, the listing agent for the property, e-mailed defendant Danielle Reyes (with a copy to Beverly Tatum) to arrange a meeting with defendants to discuss the ramifications of their decision not to proceed with the purchase of the property on

3

March 29, 2011. Ex. 12. In her e-mail, Ms. Hicks explained plaintiff's plans to move with her mother to Florida immediately after the March 29, 2011 closing date and stated that plaintiff had a contract to purchase a new home in Florida that was waiting on the closing in Alexandria. *Id.* Ms. Hicks also offered to help defendants re-sell or lease the property following the settlement date. *Id.* At trial, Danielle Reyes testified that prior to this March 4, 2011 e-mail, she and her husband had no knowledge of plaintiff's intention to purchase property in Florida.

12. On March 6, 2011, defendant Jesse Reyes sent an e-mail to Beverly Tatum, Diann Hicks and Kim Farina (the managing broker for the Alexandria office of Weichert Realtors) in which he explained that he and his wife no longer qualified for a Federal Housing Administration ("FHA") mortgage loan to finance their purchase of the property as it would no longer be their primary residence given their decision to move to Texas and that they should notify the seller so "she can make future arrangements." Ex. 13. In her reply, Beverly Tatum suggested she and defendants meet to discuss the matter, stating that it could not be resolved by e-mail. *Id.*

13. Later on March 6, 2011, Beverly Tatum again e-mailed defendant Jesse Reyes regarding a meeting to discuss defendants' decision to default on the Sales Contract and the consequences should they decide not to go through with the purchase. Ex. 14. The next day, defendants met with Beverly Tatum, Diann Hicks, and Kim Farina, the managing broker who approved the Listing Agreement and who acts as the Escrow Agent. Testimony at trial established that at the meeting, Diann Hicks suggested that defendants go through with the purchase of the property and Kim Farina encouraged defendants to seek legal counsel and to abide by the letter of the Sales Contract.

4

14. On March 7, 2011, defendants signed a proposed Release of the Sales Contract and Deposit, agreeing to release the $20,000.00 escrow deposit in exchange for a termination of the Sales Contract. Ex. 20.

15. On March 8, 2011, Diann Hicks e-mailed Kim Farina and Beverly Tatum informing them of plaintiff's rejection of defendants' proposed release, plaintiff's preference to close on March 29, 2011, and stating that plaintiff will take whatever means necessary to protect her losses. Ex. 15. That e-mail was then forwarded to the defendants by Beverly Tatum. *Id.*

16. On March 29, 2011, plaintiff attended the scheduled settlement and executed a settlement statement. Ex. 3. Defendants did not appear at the settlement.

17. Trial testimony from plaintiff, Diann Hicks, and Kim Farina established that soon after the March 29, 2011 closing date, the property was placed back on the market for sale. In an effort to re-market the property effectively and expeditiously, Diann Hicks advised plaintiff to make some improvements to the property and plaintiff agreed. Diann Hicks, an experienced real estate agent in northern Virginia, testified that in her opinion the real estate market in northern Virginia at the time was "sluggish."

18. The evidence establishes that plaintiff incurred improvement expenses in an effort to re-market and resell the property including painting and electrical work in the amount of $1,855.00. Ex. 11.

19. On May 24, 2011, plaintiff entered into a Regional Sales Contract with Steven and Judith Cohen ("the Cohens") for the sale and purchase of the property. Ex. 2. Plaintiff and the Cohens agreed to a sales price of $699,900.00 and a settlement date of June 24, 2011. Ex. 2 at ¶¶ 2, 6. At trial, Diann Hicks testified that under the circumstances this was a fair and reasonable sales price for the property at the time of the sale. The Cohens also agreed to make an earnest

5

money deposit of $20,000.00 in an escrow account and plaintiff agreed to pay a $10,000.00 seller subsidy. Ex. 2 at ¶¶ 4, 10.

20. On June 24, 2011, plaintiff and the Cohens executed a settlement statement and closed on the sale of the property. Ex. 4. This settlement statement shows a payment of $21,342.00 to Weichert ($20,997.00, representing a 3% commission on the $699,900.00 sales price, plus the $345 flat commission). *Id.* The remaining 3% commission was paid to Re/Max Distinctive, the real estate agent representing the Cohens. *Id.* The settlement statement shows a cash to seller amount of $645,984.46. *Id.*

21. The Sales Contract between plaintiff and defendants states that the sales price for the property was $750,000.00. Ex. 1 at ¶ 2. The Sales Contract between plaintiff and the Cohens states that the sales price for the property was $699,900.00. Ex. 2 at ¶ 2. Each of the Sales Contracts provided for a $10,000 seller subsidy. The Court finds that the difference in sales prices in the two Sales Contracts is $50,100.00.

22. The evidence at trial establishes that between the March 29, 2011 settlement date in the Sales Contract with the defendants and the June 24, 2011 closing on the sale to the Cohens, plaintiff incurred utility costs for the property in the amount of $266.51. Ex. 10.

23. On December 20, 2010, plaintiff executed a Sales Contract for the purchase of property in Naples, Florida. Ex. 8. Plaintiff and the sellers of that property closed on the sale on April 1, 2011. Ex. 9. The Florida Sales Contract contained a provision that it was contingent on the lease or closing of Buyer's property located in Alexandria, Virginia and if the sale did not close as scheduled by March 31, 2011, Buyer could provide notice within 3 days and the contract would be cancelled and Seller would refund the Buyer's deposit. Ex. 8.

6

24.  On March 25, 2011, plaintiff sold 4,039.044 shares of IBM stock for $656,473.34. Ex. 7.  Plaintiff testified that she used the proceeds of the sale of the IBM stock to purchase the property in Florida.  As shown on the settlement statement for the Florida property, plaintiff paid $738,764.12 in cash at the settlement on April 1, 2011.  Ex. 9.

25.  Plaintiff testified that as a result of the sale of IBM stock she incurred state and federal capital gains taxes of $69,707.05.[3]

26.  Plaintiff testified that she was aware that she had the option to cancel the Florida Sales Contract but given the arrangements she had made to move her belongings and to relocate her mother and the fact that the Florida property met her and her mother's needs, she decided to proceed to closing on the Florida property.

27.  Plaintiff testified that she thought she would not be able to obtain other sources of financing for the purchase of the Florida property and therefore she decided to sell her IBM stock with the knowledge that she would incur capital gains taxes on that sale.  At trial plaintiff provided no details concerning what other sources of financing she pursued or the basis for her belief that she could not obtain some type of short-term financing other than the limited period of time to pursue that financing.  Given that the Gibbon Street property had no liens (Ex. 5), that plaintiff had at least $656,473.34 in IBM stock available (Ex. 7), and the lack of any specific testimony or documentation that other avenues of financing were considered or pursued, the Court finds plaintiff's testimony concerning her inability to obtain other financing which would have avoided the need to immediately incur the capital gains taxes to be lacking.

---

[3] Plaintiff's certified public accountant provided a letter stating that the estimated taxes associated with the sale of the IBM stock on March 25, 2011 totaled $69,707.05.  Ex. 6.  However, plaintiff's proposed findings of facts and conclusions of law state that the capital gains taxes on the sale of the IBM stock totaled $82,448.00.  (Docket no. 32 at 4).

## CONCLUSIONS OF LAW

1.   This Court has jurisdiction under 28 U.S.C. § 1332 as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

2.   Venue is proper in this Court under 28 U.S.C. § 1391(b) as this case concerns a contract for the sale of real property at 720 Gibbon Street in Alexandria, Virginia in this judicial district.

3.   There are three elements to a breach of contract action under Virginia law:[4] (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's breach of that obligation; and (3) damage to the plaintiff caused by the breach. *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009) (quoting *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)).

4.   Based on the findings of fact listed above, the Court concludes that the Sales Contract between the plaintiff and the defendants was a valid, binding contract and that defendants breached the Sales Contract entered into with the plaintiff by not proceeding to the closing.

5.   Virginia law recognizes two categories of damages for contract breach: direct damages and consequential damages. *R.K. Chevrolet, Inc. v. Hayden*, 253 Va. 50, 56, 480 S.E.2d 477, 481 (1997) (citing *Washington & O.D. Ry. v. Westinghouse Elec. & Mfg. Co.*, 120 Va. 620, 627, 89 S.E. 131, 133 (1916)). "Direct damages are those that flow 'naturally' from a breach of contract; *i.e.*, those that, in the ordinary course of human experience, can be expected to result from the breach, and are compensable," whereas "[c]onsequential damages arise from the intervention of 'special circumstances' not ordinarily predictable and are compensable only if it is determined that the special circumstances were within the contemplation of the parties to the

---

[4] *See* Ex. 1 at ¶ 35 ("The interpretation of this Contract will be governed by the laws of the jurisdiction where the Property is located").

contract." *Id.* (citing *Roanoke Hospital v. Doyle and Russell*, 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975)). Generally, the parties' "contemplation" must exist at the time of contracting and includes "both that which was actually foreseen and that which is reasonably foreseeable." *Roanoke Hospital*, 215 Va. 796 at 801-02, 214 S.E.2d at 160; *Richmond Medical Supply Co., Inc. v. Clifton*, 235 Va. 584, 586, 369 S.E.2d 407, 409 (1988). "Whether damages are direct or consequential is a question of law" and "whether special circumstances were within the parties' contemplation is a question of fact." *R.K. Chevrolet*, 253 Va. at 56, 480 S.E.2d at 481.

6. "[W]hen a purchaser has breached a contract for the sale of real estate, the seller nonetheless has the duty of making reasonable efforts to mitigate damages resulting from the breach, and to the extent that the seller fails to do so, he may not recover the additional damages incurred." *Forbes v. Rapp*, 269 Va. 374, 380, 611 S.E.2d 592, 595 (2005). As plaintiff's failure to mitigate damages is an affirmative defense, defendants bear the burden of proof on this issue. *Id.*; *see also R.K. Chevrolet, Inc. v. Bank of the Commonwealth*, 256 Va. 74, 77, 501 S.E.2d 769, 771 (1998); *Stohlman v. S & B Ltd. P'ship*, 249 Va. 251, 256, 454 S.E.2d 923, 926 (1995); *Marefield Meadows, Inc. v. Lorenz*, 245 Va. 255, 266, 427 S.E.2d 363, 369 (1993).

7. Under Virginia law, the Listing Agreement is considered a general contract and not a special contract whereby "[w]hen an agent, acting in good faith, produces a purchaser ready, willing, and able to buy the seller's real estate upon the terms fixed in the listing contract and seller accepts the purchaser as such, the agent acquires an inchoate right to the commission described in the contract." *Kuga v. Chang*, 241 Va. 179, 182, 399 S.E.2d 816, 818 (1991).

8. Paragraph 26 of the Sales Contract states that in the event of a Default by the Purchaser, the Seller may accept the Deposit as liquidated damages but if the Seller does not elect to accept the Deposit as liquidated damages, the Deposit may not limit the Purchaser's

liability in the event of Default. Ex. 1. In this case the plaintiff elected not to accept the $20,000.00 deposit as liquated damages. Ex. 20.

9. Defendants acknowledge their failure to proceed to closing and the parties agree that plaintiff's resale of the property following defendants' breach was an expected result of that breach. Plaintiff originally marketed the property with the intention of selling it and relocating to Florida with her elderly mother and trial testimony established that plaintiff had taken significant steps to prepare for her move before the March 29, 2011 closing date.

10. Testimony at trial also established that the $50,100.00 difference in the expected price of the sale to defendants ($750,000.00) and the actual price of the sale to the Cohens ($699,900.00) was reasonable given the state of the real estate market in northern Virginia at the time. Trial testimony further established that plaintiff re-marketed the property in a reasonable time. For these reasons, the Court concludes that the difference in sale prices is reasonable and a natural, expected, and compensable consequence of defendants' breach of the parties' Sales Contract and that plaintiff acted reasonably in mitigation of the damages flowing from that breach in selling the property to the Cohens for the price listed in that Sales Contract. Accordingly, the Court concludes that plaintiff is entitled to an award of $50,100.00 for the difference in the sales price of the property as damages sustained as a direct result of defendants' breach.

11. The Court concludes that the $266.51 in utility costs incurred by the plaintiff from the March 29, 2011 closing date in the Sales Contract with the defendants and the June 24, 2011 closing with the Cohens was a direct, natural, expected, and reasonably foreseeable consequence of defendants' breach. Accordingly, a damages award in the amount of $266.51 is appropriate in this case.

10

12.   The Court also concludes that the testimony of Diann Hicks and the plaintiff establishes that the $1,855.00 in improvement expenses incurred by the plaintiff in her efforts to re-market and resell the property quickly were a reasonably foreseeable consequence of defendants' breach.  Accordingly, a damages award in the amount of $1,855.00 is appropriate in this case.

13.   Under the Sales Contract, "if either Purchaser or Seller is in default, then in addition to all other damages, the defaulting party will immediately pay the costs incurred for the title examination, Appraisal, survey and the Broker's Fee in full." Ex. 1 at ¶ 26.  The evidence establishes that the real estate brokerage fees due under the Sales Contract between the plaintiff and defendants totaled $45,345.00, representing a 6% commission on the $750,000.00 sale price plus a $345.00 flat commission as provided in the Listing Agreement plaintiff executed with Weichert Realtors in May 2010.  Exs. 3, 5 at ¶ 12.  Thus, defendants as the defaulting party are liable for the $45,345.00 in brokerage fees that Weichert was entitled to receive under the Listing Agreement.  The testimony at trial established that there was only one Listing Agreement between the plaintiff and Weichert Realtors and that the agreement remained in force after the unsuccessful March 29, 2011 settlement date in the defendants' Sales Contract.  Consequently, the Listing Agreement also applied to plaintiff's June 24, 2011 settlement with the Cohens, at which time the real estate brokerage fees due to Weichert Realtors totaled $21,342.00, representing a 3% commission on the $699,900.00 sale price plus a $345.00 flat commission.[5] Ex. 4.  Given that under the terms of the Listing Agreement and the Sales Contract with the defendants Weichert was entitled to a total of $45,345.00 as compensation and the fact that it did receive a payment of $21,342.00 under the Listing Agreement for the sale to the Cohens, the

[5] In the sale to the Cohens, Weichert Realtors represented plaintiff and Re/Max Distinctive represented the Cohens. Each received a 3% commission in addition to their respective flat commissions. *See* Ex 4.

11

Court concludes than an award to plaintiff in the amount of $24,003.00, representing the brokerage fees owed by the defaulting defendants under the Listing Agreement offset by the fees paid at the time of plaintiff's settlement with the Cohens, is appropriate in this case.

14.   Testimony at trial established that while defendants knew of plaintiff's plans to relocate to Florida with her elderly mother following the sale of the property at the time the Sales Contract was executed in November 2010, they did not know of plaintiff's intention to buy property in Florida or use any of the proceeds of the sale to finance the purchase of property in Florida until early March 2011. Thus, plaintiff's plan to finance the purchase of property in Florida with proceeds from the sale of the property to defendants was not within the contemplation of the parties at the time they executed the contract in November 2010. Moreover, the Court concludes that even if plaintiff's plan to purchase property in Florida was within the contemplation of the parties, plaintiff's decision to sell IBM stock to finance the purchase of property in Florida and to incur significant capital gains taxes cannot be considered a reasonably foreseeable consequence of defendants' breach.

15.   Even assuming for the sake of argument that plaintiff's purchase of property in Florida was within the contemplation of the parties at the time of the contract and that capital gains taxes incurred as a result of plaintiff's stock sale to finance that purchase could be considered compensable as consequential damages, the Court nevertheless concludes that plaintiff failed to make reasonable efforts to mitigate those damages. An addendum to the Sales Contract plaintiff executed for the purchase of the Florida property provided that the contract was contingent upon the sale of her Virginia property to defendants. Ex. 8. Thus, given defendants' breach, plaintiff was not obligated to go through with the purchase of the Florida property and there was no evidence that she made any inquiries concerning the possibility of

delaying the closing on the Florida property to allow for the sale of her Virginia home. There is also no evidence in the record indicating that plaintiff explored alternative means of financing that may have mitigated (or even avoided) the tax liability she incurred as a result of the stock sale.[6] For these reasons, the Court concludes that plaintiff's claim for consequential damages as a result of her stock sale are not compensable and, even if they were, plaintiff's failure to mitigate those damages militates against an award compensating her for them.

### CONCLUSION

Based on the foregoing, the Court finds and concludes that defendants are responsible and liable for the above stated damages suffered by plaintiff. After careful review and consideration, and in light of the findings of fact and conclusions of law outlined above, the Court finds that a total damages award in favor of plaintiff in the amount of **$76,224.51** is appropriate. This award represents $50,100.00 for the difference in the sales price, $2,121.51 in utility costs and improvement expenses, and $24,003.00 in brokerage fees. The Court will enter a separate Order providing for the entry of a judgment in accordance with this Memorandum of Decision and the release of the deposit for a partial payment of this judgment.

Entered this 19th day of March 2012.

_____/s/_____
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

---

[6] It should be noted that plaintiff sold her IBM stock on March 25, 2011 – 4 days before the parties' March 29, 2011 closing date.